Good afternoon. The next case, call for argument, is Sorrell v. City of Lawrenceville. Counsel, whenever you're ready, you may proceed. Good afternoon, Your Honor. My name is Mike Neal. I appear on behalf of the City of Lawrenceville, Illinois. And may it please the Court. This appeal is about a zoning decision by the Lawrenceville City Council. That decision was to deny an application of Samuel and Marita Sorrell, who owned a residential property for business use. The trial court ruled that the City had acted arbitrarily and capriciously in denying their application. The City contends that the judgment of the trial court was against the manifest way of the evidence and that the City's action was well within the parameters of proper legislative discretion. Now, by way of factual background, Sorrell owned and lived on a single lot in a subdivision which has been zoned for single family residential dwellings for a period of approximately 52 years since the City enacted a comprehensive zoning code in 1958. The Sorrell property is bounded on the south by Highway 250, which is one of the main arteries into the City of Lawrenceville. It's bounded on the east and west by residential properties located within the Groff subdivision and by unimproved acreage on the north side of the property. The property characteristics of the Groff subdivision, as well as Highway 250, have remained essentially the same since the subdivision was in fact created back in 1924, although at that point it had not been incorporated into the City limits. Now, the Sorrells wanted to change the zoning classification of their residential property for highway business use to match zoning classifications which had been made by the City of Lawrenceville on the south side of Highway 250 at a subsequent time. It's well settled that zoning classifications are a legislative function of local government and are presumed valid unless shown by clear and convincing evidence to be arbitrary and an unreasonable burden on property interests. And in its decision, the trial court, appropriately enough, used the factors that were set forth in LaSalle National Bank of Chicago v. County of Cook, a Supreme Court decision in 1957, to analyze this particular case. We think that if the court reviews the evidence of the record and applies the factors in LaSalle, that the trial court in fact made a finding that was against the manifesto of the judges. The first factor that I would like to discuss is the fact of whether or not the residential classification of the Sorrell property was consistent with the existing uses and zoning here by property. Now, we think the court erred in that it concentrated on what the commercial development had been on the south side of Highway 250 rather than looking at the actual property characteristics of which existed on the north side of Highway 250 for many years. As I indicated in my statement of factual background, the Sorrell property is located within the Groff subdivision, which has historically been a residential subdivision at all times. There are no businesses located within the Groff subdivision, nor at any time has the city ever amended the zoning code to permit business development in the Groff subdivision or any part of the north part of the Highway 250. However, the court, we think, inappropriately looked at the development that would have occurred on the south side of Highway 250. Now, the property on the south side of 250 had actually been annexed into the city in the late 80s as part of a comprehensive plan to promote commercial development in the city at about the same time there had been a TIF district established at that point in time. And subsequently there was commercial development, which as we indicated in our brief was such things as a Walmart, a pharmacy, and other retail businesses. There was also a Jane Street, a north-south road, which was constructed by the city, which went through the TIF district and intersected with Highway 250. The commercial development, however, on the south side of 250 was entirely consistent with the comprehensive plan adopted by the city in 1989 for the purpose of the TIF. And in that comprehensive plan, the city specifically indicated that it wished to preserve the triangular area on the north side of 254 for residential development. So in other words, the maintenance of the Groff subdivision for residential purposes was entirely consistent with the comprehensive plan. The fact that there's been commercial development on the south side of Highway 250 is not indicative of arbitrary or capricious action by the city in limiting development on the north side. As we indicated in our brief, there are numerous cases which hold that the municipality has discretion in determining appropriate zoning boundaries as well as using highways as a natural divide between different zoning districts such as residential and commercial. The fourth factor, which we think the court inappropriately looked at, was the existence of a nonconforming use within the Groff subdivision. And there was much evidence of trial presented on this particular point. There was a property owned by George Tipsord, which he had owned for many years prior to annexation in the city, prior to the enactment of the zoning code, in which there was an auto repair shop located behind his residence. He actually lived on his lot. He also operated an auto repair shop. That was in existence at the time the zoning code was enacted. The plaintiffs in this case have emphasized the existence of that nonconforming use. And I think the trial court inappropriately placed too much weight on the existence of that nonconforming use. The case law, I think, is pretty consistent that a municipality has the right to try to limit nonconforming uses within any particular zone. That is to say, simply because there is a nonconforming use in existence, that would not necessarily give the municipality the right to incrementally begin allowing other nonconforming uses. That would essentially amount to, in this case, commercial free or spot zoning. And the cases that we have cited in our brief that I think are particularly relevant on that are Amalgamated Trust and Savings Bank v. County Cook and Boston Beach v. Pelletier River. Another factor which we think the court erred on was when it determined that the value of this real property had actually diminished as a result of this residential classification. In fact, there was no evidence presented by the plaintiffs at this trial, expert or otherwise, indicating an actual loss in value of the residential property. The only person called in that regard was David Krask, local realtor. And Mr. Krask quite forthrightly indicated that he could make no opinion as to a loss in value. Moreover, he indicated that, in fact, allowing the rezoning of a single lot could, in fact, detrimentally impact the property value of neighboring properties. The other thing that I think the court did not key on or should not have keyed on was prospective loss of value. The trial courts indicated that, well, by not allowing the Sorrells to open business on their property, they have suffered a loss in value. Well, I think the courts have been fairly consistent on this point, that prospective loss of value is not a basis to determine whether or not there's been a diminishment in value, particularly where the property owner is well aware before he buys his property what the zoning classification is. And in this case, there was no issue there that the Sorrells realized that when they bought their property in 1994, it was a residential subdivision, that it was surrounded by residential properties within that subdivision. Knowing that, they went ahead and proceeded to buy the property. The fact that they could now show an increase in the value of their property by changing the zoning classification operating the business there would essentially allow any type of rezoning. And I think the courts have said in those situations that it's entirely inappropriate for that to occur because essentially in all cases, you could enjoy an appreciation of value of the property if it was allowed to be rezoned for commercial purposes. The court also indicated, and this would apply more to the third factor, which the court addressed, that it did not promote the general welfare of the public, the existing zoning classification. The court cited the loss of additional tax revenue to the city. Again, the case law, I think, on that is fairly consistent. That is not a determinative issue. There was no actual evidence of loss of additional tax revenue simply because the Sorrells, at the time of trial and at the time that they initially applied for their zoning, did not with any certainty indicate what kind of business they were going to operate. Secondly, the adjoining landowners are a factor here as well. The neighbors testified at quite length as to why they felt that changing the Sorrell property for business purposes would have a detrimental impact not only on their enjoyment of their premises but on the potential loss of value of their property. The trial court found that there was no showing of substantial public benefit by keeping the Sorrell property residential. We think that was wrong. We think that the city had a legitimate interest in maintaining the integrity of the triangular area for residential development in deference to its comprehensive plan. And as one of the witnesses testified, I believe, Alderman Goff, that if there was allowed residential development within the triangular area, presently zoned residential, that could have a detrimental impact upon the city's ability to develop and continue to develop the tip district, which had the remaining acreage there available for business development. The court, again, I think unduly emphasized the hardship on the Sorrells, citing the point that the business the Sorrells currently operate is located in another town about four miles away. However, again, I would emphasize that the Sorrells bought this property knowing its zoning classification, and, therefore, I do not believe that that is a relevant factor. When the Sorrells bought the property, and it may have been the brief, but I don't remember, was that nonconforming use down the block in existence at that time also? The other repair shop? The other repair shop, the Tip Sword Auto Repair Shop, was in operation at that time. Okay. That's why I wanted to ask. That's correct. Finally, Your Honor, two points. The trial court, we think, erred in not finding that the Sorrell property is suitable for its own purpose. That's one of the south factors that courts look at. Is the property in its present condition suitable for its own purpose? Clearly, the Sorrell property was suitable for residential purposes. They were living there. All the other properties in the subdivision are residential properties. There was no evidence of unsuitability. In fact, the court, I think, at the flip of the factor on its head, I think the court acknowledged that the property was suitable, but said, well, in my opinion, it would be more suitable or just as suitable for commercial development. Well, that's not the test. The test is whether or not, because municipalities have wide discretion at this point, the test is whether or not it's suitable for its existing purpose. There was simply no evidence to support the trial court's finding that the Sorrell property is more suitable for commercial use. The final factor, Your Honor, which the trial court addressed, the criminal property was vacant. Now, that's one of the LaSalle factors. That is to say, if there's a property that's been zoned for particular use for years and years, and it's vacant and undeveloped, that's a factor, a legitimate factor courts can look at and determine whether or not the existing zoning classification is out of whack, essentially. That's not the situation here. What the court did was say, well, the Sorrells are using their property for its own purpose, but they built a garage that they wanted to use for a business, and they can't use it. So therefore, it's not vacant in the literal sense, but they're not being able to use one of the buildings on their property as they intended. And I characterize that as almost kind of a constructive vacancy argument. That is, they're living there. They're using the property. They're enjoying it pursuant to the zoned purpose, but it's constructively vacant. There's no case law to support that notion, and the garage which was built was built pursuant to a permit the city had issued for residential zoning. And the fact that the Sorrells built this garage farther away from the house and it might be convenient to them for residential purposes, we think, just should not have very much way in determining whether or not the city acted within its discretion. We think in this case, Your Honors, that what the court did was substitute its own judgment. This isn't the court may have thought, well, commercial development is possible here. The question is whether or not the municipality acted arbitrarily and capriciously in this case. And I don't think there was any evidence that it did. It was maintaining a residential subdivision for residential purposes. And we think, as I say, the trial court substituted its own opinion or judgment, and we think that was improper. Thank you. Thank you, Counsel. Counsel? May it please the Court? I'm John Racklin. I'm here on behalf of Samuel and Anita Sorrell. I believe that Mr. Neal, in his recitation of the facts of this case, did a pretty good job of setting forth the foundation as far as the time frames and things like that. However, there was a lot of mention about this subdivision, and I think that's the first point that needs to be addressed before this court today. This is not a subdivision in the traditional sense that one views a subdivision. This isn't 150 houses all grouped together with swings in the backyard and kids running around in the alley. In reality, this subdivision is a strip of approximately 10 houses and a business over about a half-mile span of a state highway that's on the very edge of town. Behind this property is 60 acres of farmland. On the other side of the major highway is the TIF district for the city. This is the main developmental area for the city. It was undisputed in the testimony given, whether it was by the defendant's witnesses or the plaintiff's witnesses, that this is the only area in which the town can develop as a commercial district. There's issues with rivers and flooding in other parts of the town, and this is the part that makes sense. So that's, I think, the first thing that needs to be brought to the court's attention, is what exactly are we dealing with? Mr. Neal also mentioned that this subdivision has always been a subdivision, has always been residential, and there's no businesses located in the subdivision. That is inaccurate. In fact, there is this testimony of the TIF SOAR repair business, which is similar to the business that Mr. and Mrs. Sorrell would like to have. Where is the auto zone? The auto zone is down the street about four blocks. But on the south side? No, it is on the north side. It is on the same side of the road as the plaintiff's property. But not in the mix of the housing, the subdivision housing? Correct. The subdivision ends just a few blocks east of the plaintiff's property. The road then curves and makes a slight jog to the right and continues on down, where you would find the auto zone, like I said, approximately three or four blocks down on the same road, on the north side, on the same side of the road. With regards to the issue of the TIF SOAR business, it is actually located on lot 15 of the golf subdivision. So to make a claim that it's not in the subdivision is factually inaccurate. It is actually located in the subdivision. Will there be in the record any exhibits that visually portray what everyone's described in their briefs? Yes. The exhibit that would show the subdivision as it's platted is defendant's exhibit B is a map that shows the way the city is. Golf subdivision is actually another exhibit that has been mentioned as well. You don't have to. But there is an original plat that shows the 1924 plat of how this is. And the Sorrell property, for the record, is on lot 13. TIF SOAR's property is on lot 15. So it's actually, there's just one lot in between the two properties. With regards to auto zone, what's interesting about the auto zone issue is that it's a very similar situation in that it's located along this highway. There's residential property located behind it and surrounding it. And in that particular situation, the zoning board that recommends whether the city should approve or disapprove the proposed change actually recommended that the city not make the change of the classification. Nevertheless, the city council in the auto zone matter went against that recommendation and approved the change from a residential classification to a B3. So we have the reverse. In this particular case, we have the exact reverse. Just a few years down the road, same city council members for the most part. And for those reasons, that's why we think the trial court was appropriate in considering auto zone and that particular rezoning, in this case, TANF. In addition, Mr. Neal said that, of course, highways in this area divide residential and commercial areas. I don't find that to be true. In fact, the city's own comprehensive plan basically details a framework where businesses are located along the main thoroughfares of the town with residential property behind it. This just naturally makes sense because truck traffic and deliveries and consumers would travel down the main thoroughfares to get to the commercial properties, whereas residential would be located behind it. I think that's true of most towns where one would travel. Well, now, this subdivision was planted in the 20s. 1924. And I'm just presuming maybe that street had a different – it was widened at some point. This is a state highway. It's State Highway 250. But it had been widened. It has been widened as a result of this recent development in the TIF district. There's been a new super Walmart that's come into the TIF district. There's a brand-new McDonald's that's less than 150 feet from my client's house. There's a vacant CVS building there. There's a Dollar General, Ace Harbor. There's numerous other businesses that are located in this district. Because of this increase in traffic that the city presumed would happen when super Walmart came in, the city has widened – and I guess the state has widened this thoroughfare and has put a stoplight directly in front of my client's property. And this is part of the issue that my clients are having with their particular house, with their location, is they actually have to pull out onto a traffic sensor in order to get out of their driveway. So the problem this creates is that all hours of the night, the stoplight's changing colors, that shines into their house. What used to be a pleasant front yard with large maple trees has now been replaced by a stoplight. All the trees have been removed, and the house that they live in now, although may be suitable for residential in the sense that somebody could live there, it is not desirable as a residential property any longer. And these lots, these subdivision lots, are big lots. They're an acre each in size. These are not small residential quarter-acre lots. They're long, they're deep. The garage that my clients built on their property is some 400 feet. The lot is 400 feet deep. It's some 270 feet from their house. It was built with the understanding that it could be used as a garage. It was built away from the neighbor's houses so that there was not noise or other issues. A lot was made about the tip sword business, that it should not be considered because it's a non-performing use. That is correct in that the law says the court should not solely use non-performing uses for a reason to override a city's chosen zoning. But what the court did in this case, and I think if this court would review the judge's written judgment, he looked at it in the sense that this is the same business. It's operated there for 40 years. The neighbors all testified that there have been absolutely no problems in this business being there. It hasn't caused noise problems. It hasn't caused pollution. They actually said, one neighbor in particular said, it's quiet as a mouse. What the judge said is the Sorrells want to run this exact same business. It'll even be further away from these houses than Mr. Tipsword's business. The trial court failed to see how Mr. Sorrell's business would affect the health, safety, and morals of this area. And that is the true test that's before this court. I'm reading from Joseph Lumber versus the City of Chicago, which is an Illinois Supreme Court case from 1949, that the ordinance must have a real substantial relation to the public health, safety, morals, or general welfare. A zoning ordinance may be valid in its general aspects, yet invalid as applied to a particular piece of property. When the means employed bear any relation to the public, when they do not bear any relation to the public health, comfort, safety, or welfare, the ordinance should be found to be invalid. And that's the issue that's really before this today, is whether this zoning that's applied to the Sorrells' property is in fact undeserving and unjust, and it creates a hindrance on the Sorrells' right to use their property as they see fit. The other issue that's been brought forth in this case is the comprehensive plan. As I mentioned, the comprehensive plan is something that the city has relied heavily on as a defense. This plan was enacted in 1989. The city's own witnesses indicate that it's in the process of being revamped, because the city has outgrown this plan. It needs to be changed. In fact, the city, by way of a letter, which is plaintiff's Exhibit 3, indicated that this area, including the Sorrell property, needed to be rezoned. And I read, the city would like to rezone this property to business. The city feels that it would be more beneficial to all parties if the entire area was rezoned to business. The city is very excited about the growth in this area, and hopes it will be a great asset to the entire community. The problem I have with their argument today is, they are saying the trial court was arbitrary in making its determination with regard to the Sorrells' rezoning request. The city, in and of itself, at the same time, said, hey, we think this area is developing. We think this area should be business. You know, it's hard to say that on one side, and then come back and argue that the court wasn't justified in rendering its ruling. There's been some mention about the neighbors. The testimony is, and the court can review that, that there's been a substantial amount of bad blood between the Sorrells and the neighbors that has absolutely nothing to do with the business. One involved, something involved with a swimming pool. Issues totally unrelated to running a business, and that's why these neighbors have a problem with the Sorrells. But even those neighbors testified that they thought there would be an increase in value as a result of this property being zoned commercial, or the whole area being zoned commercial. And there's also been the issue of spot zoning that has come up. The city's own zoning ordinance provides specifications to avoid spot zoning. Now, this property is almost double the size of the city's own requirements to avoid spot zoning. So to try to argue that this would result in spot zoning goes against the city's very own written ordinances. The court, Mr. Neal mentioned to the court the issue of amalgamated trust. In that case, the court found that the proposed development would affect the community as a whole. The facts of that case are so much different from the case at hand, it shouldn't even be compared. In that case, the person was wanting to develop condominium towers, a banking center, a shopping center, a 25-story building. That's far a substantial difference from what the Sorrells are asking to do by running a business out of their property. And in fact, the acre track of land would not substantiate the development that was suggested in the amalgamated. One thing for the court to consider is the gains to the public versus the hardship of the Sorrells. That's one of the factors of the LaSalle case, and I think incredibly important in the case at hand. The Sorrells had to file bankruptcy as a result of not being able to operate a garage on their property. They've had to travel to operate a business, but have to travel every day, five miles each way, although it's minimal. Over a course of a year, that adds up. In addition, they have had to rent a building to run their business. These have all created hardships on the Sorrells, but there's been no testimony of any gain to the public as a result of this current development. Was there testimony about how the bankruptcy tied into… The Sorrells built and borrowed money to build this building in anticipation of running a business out of it. But they knew it wasn't zoned to run the business when they chose to build the structure. They received a permit from the city that allowed them to build this building. They were under the impression that because the permit granted them the ability to build a building that was larger than what would normally be considered residential, that they would be able to operate a business from this building. But that basically was, I guess, ignorance of the law, because there hadn't been any rezoning. Correct. There had not been any rezoning at the time. That is correct. And that is why, once the Sorrells became aware of the situation, they then applied not once, but twice, to have the property rezoned. They originally applied back in 2002 to have this property rezoned. This case stems from their most recent request, which was brought in 2007. So they actually tried to have it rezoned once. It didn't go through. They went back, reformulated, and came back again in 2007. The other issue that was brought up was the issue of a case involving tax revenue. The trial court did mention the fact that this would increase the tax revenue to the city, which would be a benefit. The case of the site was concerned citizens versus the city. In that case, the sole justification given by the city in wanting to have the property rezoned was to increase tax revenue. That was not any reason given by the petitioners, by the plaintiffs in this case. But rather, the court simply mentioned tax revenue as an incidental benefit that would accrue to the city if this were to be rezoned. I think it's important to consider what the highest and best use is and what the Sorrells should be able to do with their property. That's what the trial court viewed. That's what they looked at. The trial court also looked at the factors in the LaSalle case, went through them one by one. There's the issue about whether the property was considered constructively vacant. The law is that not one factor is controlled. This is a totality of the circumstances argument. I don't expect my client to win every single point of the LaSalle case. But I believe when viewed in the totality of circumstances, the trial court made the right rule. What we're here today to argue is whether it was against the manifest weight of the evidence. And the finding is against the manifest weight of the evidence if it's unreasonable or arbitrary or an opposite conclusion is clearly made. Basically, what this court has to find is that the trial court's finding of arbitrariness on the part of the city is arbitrary. I don't feel that the city in its written brief and its argument has shown that the judge, trial judge in this case, acted unreasonably. In fact, who would be in a better position to view what's going on in the city of Lawrenceville? Judge Dunn has traveled probably a hundred times back and forth from Albany to Lawrenceville. Has traveled through this area, has observed the makeup of this town. He is the one who is familiar with how this is. It's hard for us to come to this court and explain to you the exact dynamics of Lawrenceville. But I believe Judge Dunn was in the best position to do that. Did he recite in the record that any of his decision was based on his personal observation of the circumstances in Lawrenceville? I don't believe, if he did, he would be contained in the judgment. I don't believe he ever made any statements on the record to that. Nevertheless, though, I do believe in arguments or in the course of the trial, he had indicated that he had traveled down that road and was familiar with that area. I don't think he necessarily said the extent to which that affected his decision, but he did acknowledge that he was very familiar with this. No one requested a view or anything, did they? No, I don't think so. And I believe it's because all the parties were very familiar with this particular area. The town of Lawrenceville is only a town of about 5,000 people. And like I said, this is one of the main thoroughfares into the town, the one we're talking about here. And in fact, I think the judge may have mentioned he may have even stopped at the stoplight that was in front of the Sorrell's house one day on his way through town. For those reasons, we believe that this particular track of ground no longer has a residential characteristic. It's been changed as a result of stoplight. The tip swords have run the same business for almost 50 years, just 150 feet down the road. It had no adverse impacts on the community. Neighbors have absolutely no problems with it. And we believe that the trial court was appropriate in finding that the city acted arbitrary and capriciously in refusing to grant Mr and Mrs Sorrell's request to have their property rezoned to V3 Highway. We would respectfully ask this court to uphold the judgment of the trial court and affirm that decision. Thank you. Thank you, Counsel. Counsel. Thank you, Your Honor. Several points I'd like to address in rebuttal. One is in regard to the hardship issue. Again, Plaintiff's counsel wants to emphasize the fact that his clients constructed a garage on their property that they wanted to use for business purposes and now can't. However, the trial record, I think, is unequivocal in this point. First of all, this property had attempted to be rezoned by the predecessors entitled on at least two occasions and had been turned down. Mr. Sorrell himself had attempted to rezone this property once and had been turned down. He then applied for a permit to build a garage in an R1 zone, which was – a permit was issued to build a garage in an R1 zone. And it's in the trial record as one of the exhibits. The permit specifically informs the property owner that the garage is to be built pursuant and subject to the terms of the zoning classification being R1. Mr. Sorrell self-inflicted any harm upon himself. As the trial record further indicates, he acquired the property knowing it was zoned residential. He had the advice of counsel at the time he acquired his property. It was sold to a realtor. There was no hidden secrets or anything about what the nature of this property was. So that's why we feel the trial court may have felt sorry for the Sorrells, may have been sympathetic to the Sorrells, but unfortunately the Sorrells put themselves in the position that they were in. And I would have to counter the argument there was no persuasive or credible evidence that because Mr. Sorrell had to operate his body shop at another account, that resulted in his bankruptcy. He testified that he and his wife filed bankruptcy, but there was no persuasive evidence that it was due to the fact that he couldn't operate his body shop on his own property. Now, the Tipsworth property is in the Groff subdivision. I indicated that in my prior argument. But it was a preexisting, nonconforming use. It was what I would call a family-run business that has been there for years and years. Now, the argument is, well, Tipsworth run an auto repair business. Why can't I run a body shop or something else? And that's the key. Or something else. The city council of Lawrenceville was faced with the issue of whether or not to rezone one single residence for business purposes. Not for a particular business purpose, but for a B3 zone, highway business. Which means that it wasn't just a question of whether or not that property was going to be used for what Sorrell at trial claimed they were going to use it for. It would be for any type of commercial activity within B3. Anything from a fast food to a retail to a convenience store. That is what the city council of Lawrenceville is faced in making its decision as to whether or not to rezone this one tract within a subdivision. Now, it is true that the mayor, and this is reflected in the trial record, when the Sorrells were first contacted the city and contacted the mayor about rezoning their tract, he floated the balloon. Well, if we're going to rezone, rezone the whole area. And he, in fact, sent a letter out to that effect. But it was shot down immediately as indicated by the testimony of the zoning administrator and other aldermen. In other words, there was no support within the community there to rezone that area. That is in no way prejudiced or somehow impacts the council decision on this particular issue to rezone that one lot. The auto zone business, again, that was something that the trial court, I think, mentioned and plaintiffs have emphasized. The auto zone, first of all, is not in the draw subdivision. It is not on the same highway. Moreover, as the testimony, I think, of the former mayor of Lawrenceville indicated, that was, at the time that it was rezoned, a vacant parcel and historically had been a commercial property. That is to say, somewhat akin to the tip sort property, there had been a business, a small grocery and an ice cream store on this particular lot for years and years, even before the zoning code was enacted. At the time that auto zone applied for rezone, the property had been vacant, abandoned for many years. That is entirely different than what we have here where we have a residential property being used for that particular purpose smack dab in the middle of other residential properties wanting to be carved out and be made a business locale. The auto zone, again, you can go to any town and you're going to find properties in particular areas, but you have to look at the history of it. In this, the auto zone, the history of that particular property was entirely different from the plaintiff's property. Thank you. Thank you, counsel. We appreciate the briefs and arguments of counsel.